Michael A. McKuin, State Bar No. 103328
Attorney at Law
P.O. Box 10577
Palm Desert, CA. 92255-0577
Telephone: (760) 565-7598; FAX: (760) 406-4279
Email: mike@mckuinlaw.com; mmckuin@aol..com

Attorney for Plaintiff, MARC MILLER

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARC MILLER, an Individual,<br><br>Plaintiff,<br><br>vs.<br><br>AETNA LIFE INSURANCE COMPANY, the Insurer and Plan Fiduciary of the Bank of America Corporation Long Term Disability Plan, an Employee Welfare Benefit Plan established pursuant to 29 U.S.C. Section1001, et seq. (ERISA),<br><br>Defendant. | ) CASE NO: 8:16-CV-1381<br>)<br>) **COMPLAINT**<br>)<br>) 1. Recovery of ERISA Plan Benefits<br>)<br>) 2. Breach of Fiduciary Duty<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FIRST CLAIM TO RECOVER BENEFITS DUE UNDER ERISA PLAN**

**29 USC Section 1132(a)(1)(B)**

***Jurisdiction***

1. This is an action to recover benefits and to clarify rights to benefits under an employee benefit plan, established pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001, et seq. ("ERISA"). Accordingly, subject matter jurisdiction is proper under 29 U.S.C. Section 1132 (a)(1).

***The Parties***

2. Plaintiff, Marc Miller, is an individual, residing in California.

3. Defendant, Aetna Life Insurance Company ("Aetna") is a corporation, transacting business throughout the United States and California, including this District, and having its corporate headquarters in Hartford, Connecticut.

4. Bank of America Corporation is a corporation transacting business worldwide and throughout the United States and California, including this District, having its corporate headquarters in Charlotte, North Carolina.

5. Merrill Lynch was an investment management company. It is presently the wealth management division of Bank of America.

6. In 2008 Plaintiff began work as a Financial Advisor, Vice President, and Accredited Asset Management Specialist ("AAMS") at Merrill Lynch, which was subsequently acquired by and merged into Bank of America Corporation.

***Bank of America Employee Benefits***

7. Bank of America had in full force and effect an employee benefit plan, established pursuant to ERISA, described as the Bank of America Corporation Long Term Disability Plan ("the Plan" or "the LTD plan").

8. The Long Term Disability ("LTD") benefits provided by the LTD plan were fully insured and administered by Aetna

9. The "Plan Administrator" of the LTD plan was the Bank of America Corporate Benefits Committee.

10. The claims administrator and a fiduciary of the LTD plan was Aetna.

11. Plaintiff was a plan participant and beneficiary of the LTD plan.

12. Bank of America provided Short Term Disability ("STD") benefits, self-funded by Bank of America and administered by Aetna ("the STD plan"), as well as a Leave of Absence (LOA) program, which was administered by Aetna.

13. The LTD benefits provided by the LTD plan are described in the Aetna Group Policy No. GP-811383 ("the Policy"), which provides that Plaintiff's LTD benefits are equal to 60% of his pre-disability earnings, subject to certain offsets.

14. "Predisability Earnings" are defined as: "(T)he amount of salary or wages you were receiving from an employer participating in this Plan on the day before a period of disability started, calculated on a monthly basis. It will be figured from the rule below that applies to you. . . . If you have an Annual Benefits Base Rate (ABBR), your LTD benefits will be based on your ABBR in effect on the date you first become disabled, calculated on a monthly basis."

15. Plaintiff's ABBR -- for disability benefit calculation -- was $428,455.15 ($35,704.60 per month). Thus, his monthly LTD benefit amount would be approximately $21,422.78, less applicable offsets, if any.

***Plan Definitions Pertaining to STD and LTD "Disability"***

16. The STD plan defines "disabled" as the "inability to perform his or her essential occupation functions, including working the associate's regularly scheduled hours for more than seven consecutive calendar days . . ."

17. The LTD Policy defines "Test of Disability" as follows:

> "From the date that you first become disabled and until Monthly Benefits are payable for 18 months, you will be deemed to be disabled on any day if: you are not able to perform the material duties of your own occupation solely because of: disease or injury; and your work earnings are 80% or less of your adjusted predisability earnings.
>
> After the first 18 months that any Monthly Benefit is payable during a period of disability, you will be deemed to be disabled on any day if you are not able to work at any reasonable occupation solely because of: disease; or injury.
>
> If your own occupation requires a professional or occupational license or certification of any kind, you will not be deemed to be disabled *solely* because of the loss of that license or certification."

18. The Policy defines "Material Duties" as: "These are duties that: are normally required for the performance of your own occupation; and cannot be

reasonably omitted or modified. However, to be at work in excess of 40 hours per week is not a material duty."

19. The Policy defines "Own Occupation" as: "This is the occupation that you are routinely performing when your period of disability begins. Your occupation will be viewed as it is normally performed in the national economy instead of how it is performed: for your specific employer; or at your location or work site; and without regard to your specific reporting relationship."

20. In *Evans v. Bank of America Corporation*, Case No. C 11-06271, (ND CA 2012) (October 25, 2012), the District Court found these same two definitions of STD and "Own Occupation" LTD "disability" to be *"virtually identical"*.

21. The Policy defines "Reasonable Occupation" as: "This is any gainful activity for which you are; or may reasonably become; fitted by: education; training; or experience; and which results in; or can be expected to result in; an income of more than 60% of your adjusted predisability earnings."

***Plaintiff's "Own Occupation"***

22 Plaintiff's occupation was fast-paced, involving a very high level of stress and requiring multi-tasking and extreme mental sharpness and focus. He was responsible for making investment decisions for millions of dollars of clients' assets. He also had to continually monitor markets, determine clients' investment objectives, assess and weigh risks against potential returns, while taking into account the risk tolerances of individual clients in order to implement investment plans. He also had to attend seminars and community events for promotion and marketing purposes. His average day required sitting for 6 hours, standing 1 hour, and walking 1 hour and involved 4-5 hours of computer work, 2-4 hours of telephone calls, 2-3 hours of client meetings in or out of the office, and 1-2 hours of reading, research and company reports.

23. Plaintiff's AAMS designation was issued by the College for Financial Planning, which falls under the Financial Industry Regulatory Authority (FINRA).

The College for Financial Planning has established a Professional Code of Ethics that sets forth minimum standards of acceptable professional conduct for those individuals authorized to use the marks Accredited Asset Management Specialist or AAMS. The Code sets forth the responsibilities of each AAMS designee to the public, to his or her colleagues and to clients. Adherence to this Code of Ethics by persons authorized to use the AAMS designation is mandatory. Failure to adhere to the Code of Ethics could result in revocation of the right to use the marks.

24. The AAMS Code of Ethics specifically requires that an "Accredited Asset Management Specialist designee shall act with competence, exercise due diligence and use prudent professional judgment in all professional activities."

25. FINRA has its own rules and standards, including but not limited to, Rule 2111, "Suitability", which holds members responsible for recommending certain transactions or implementing investment strategies. Under General Principle .01, "The suitability rule is fundamental to fair dealing and is intended to promote ethical sales practices and high standards of professional conduct."

26. Given the AAMS Code of Ethics and Rule 2111; the demands of Plaintiff's occupation; and the extent of his impairment (as herein alleged), it would have been unethical for him to have continued on in his occupation.

***Plaintiff's Disability***

27. Plaintiff was originally injured in a parachuting accident in 1995, while in the U.S. Army. Since then, his back pain has grown progressively worse. He has been diagnosed with severe back pain, degenerative disc disease, and neuropathy / stenosis, the extent of which is objectively established by an 11/18/13 MRI by Sydney Stevens, MD and an 11/26/13 EMG by Thomas McKnight, MD.

28. According to a 3/7/15 Expert Independent Medical Review by Donald Miller, MD, "Over the last 18 - 20 years there has been a progression of accelerated degeneration of his thoracolumbar spine. This has been borne out by his clinical deterioration as well as the serial MRI exams that show progressive

acceleration of his disc and facet joint diseases. Mr. Miller has been faithful in respect to an exercise program and carrying out recommendations made by his treating physicians. He has gone through the typical Pain Management Protocol in respect to epidural steroids, etc. He has kept his weight at an ideal level. Despite this, he has become progressively disabled."

29. Plaintiff has undergone physical therapy and epidural injections to control the pain. Currently, the long term treatment plan is to manage his pain with medications. Because of pain and impaired focus and concentration associated with narcotic pain medication, he became unable to handle the rigors of his occupation. He left work on 4/2/15 and has not returned since. On or about that same date he submitted a claim for STD.

30. There are numerous documents in both the STD and LTD files which demonstrate that the STD and LTD claims investigations overlapped substantially.

31. Sultan M. Chopan, MD has been Plaintiff's family physician for many years and is the medical professional most familiar with his restrictions, limitations and impairment, which he has described on many occasions in numerous reports in the administrative record. His 4/6/15 progress note states, "(H)is pain is getting out of control, affecting his job . . . I have no problem putting him on disability, because he has a legitimate reason for his chronic low back pain, he has done everything in his power to get better and continues to pursue treatment to overcome his back pain . . ."

32. On his 4/20/15 Attending Physician Statement (APS), Dr. Chopan said that Plaintiff might return to "modified duty" in a year, but would never be able to return to full duty work.

33. A 4/26/15 report by Dr. Donald Miller again referenced Plaintiff's injuries and resulting impairment, noting "significant radiation of pain and numbness into his left lower extremity". It further stated, "His disabilities are permanent nature, and his back condition will only continue to worsen with the

passage of time. . . . I would not advise surgical intervention in the near future. In particular, lumbar fusions are associated with long-term significant damaging effect to the discs adjacent to the fusion."

34. A 4/30/15 letter from Hope Ferrante, STD / LOA Benefit Manager, to Plaintiff constituted an initial denial of his STD claim. It stated, "It has been determined that there insufficient exam findings to support your inability to perform the essential elements of your occupation . . . . Specifically, Dr. Chopan . . . did not provide measurable, quantifiable, physical exam findings along with diagnostic test results to correlate your disability."

35. In a 5/4/15 Progress Note Dr. Chopan stated, "(H)e takes his Norco one every 4 hours. . . . being a narcotic, can impair his judgment and he may not have complete presence of mind to advise and counsel his client appropriately."

36. On 5/18/15 Plaintiff was evaluated by Anoopinder Singh MD, a psychiatrist, who diagnosed "Adjustment Disorder, chronic with mixed anxiety."

37. 5/19/15 memo from Plaintiff to Aetna states, "I would like to appeal the decision made on my STD claim . . . I am submitting more medical evidence to support my claim."

38. Munish Lal, MD has been Plaintiff's pain management specialist for many years. Dr. Lal's numerous reports in the administrative record repeatedly document and confirm his objective examination findings of tenderness at C5 - C6, L4 - L5, and restricted range of motion, limited by pain.

39. A 5/19/15 office visit note of Dr. Lal describes a physical examination on that date. It states: "Cervical Spine . . . Range of motion is restricted with flexion limited to 10 degrees limited by pain and extension limited to 10 degrees limited by pain. Spinous process tenderness is noted at C5 and C6." "Lumbar Spine . . . Range of motion is restricted with flexion limited to 10 degrees limited by pain, extension limited by pain, lateral rotations to the left limited by pain, lateral rotations to the right limited by pain. Spinous process tenderness is noted

on L4 and L5. Lumbar facet loading is positive on both the sides. . . ."

40. A 5/20/15 office visit note of Dr. Lal states, "Operation performed: 1. Transforaminal left Lumbar Epidural steroid injection using fluoroscopy at the level L5, S1. 2. Epidurogram. 3. Interpretation of epidurogram."

41. A 5/11/15 MRI report of Dr. Stevens states, "Advanced degenerative disc disease L2-3 and L5-S1 plus overall moderate disc thinning at L-5. L5-S1; a more prominent broad-based disc osteophyte complex across the endplate margin compared to the other levels with moderate facet arthropathy. Moderate proximal lateral recess stenosis could contact the proximal left S1 root without compression. There is contact on the lateral course of the exited left L5 root. . . ."

42. In his 6/1/15 report of Dr. Donald Miller interpreted the 5/11/15 MRI report by Dr. Sydney Stevens as follows:

> "When compared to the prior MRI of November 18, 2013, there was definite further deterioration at the L5/S1 level - Specifically, the disc osteophyte complex was greater, particularly in the region of the left foraminal canal. The disc osteophyte complex was now contacting the left L5 nerve root, whereas in 2013, there was no contact being made with the S1 nerve root. . . . It is my medical opinion that Mr. Miller is on a continued downward clinical course in respect to his lower lumbar spine. There is no question that his symptoms are escalating, and his ability to function just in everyday activities is being significantly diminished because of the lumbar pathology/symptoms."

43. Plaintiff's internist, Paul Schnur, M.D. stated in his 6/8/15 letter report "I have been treating this patient, Marc A. Miller, for back pain since 2009. His lumbar degenerative disc disease has gradually worsened over this time and the pain, and need for pain medication (hydrocodone / APAP 10/325 mg every 4 -6 hours), is now to the point where he can no longer adequately function at work."

44. A 6/9/15 office visit note of Dr. Lal indicates that examination

findings and diagnosis were the same as he previously stated. A follow-up 6/18/15 office visit note of Dr. Lal references another "Lumbar facet joint injection at L4-L5, L5-S1. Bilateral for a total of 4 joints injected."

45. A 6/19/15 "Peer Review" report of Stuart Rubin, MD (Pain Management) was prepared for Aetna, at Aetna's request. The report indicates a comprehensive review of the file, including job description, correspondence, medical records and reports, as well as a telephonic consultation with Dr. Donald Miller. The report sets forth the medical history, complaints, diagnosis and treatment. Dr. Rubin then stated as follows:

> "It is the opinion of this reviewer that this claimant has clinical abnormalities . . .These include severely diminished and painful lumbar range of motion and cervical range of motion, tender lumbosacral region and sciatic notch, inability to sit greater than 15 minutes without pain, worsening disk osteophyte complex at L5-S1 contacting the left L5 nerve root (in 2013 there was no contact being made with the S1 nerve root), narcotic dependency affecting the claimant's cognition. It is reasonable that this will continue through 6/30/15 since the claimant's condition is chronic has been getting worse. . . . the clinical abnormalities discussed above, translate to the following restrictions and limitations: Sit: Fifteen minutes at a time, up to three hours per day. Stand/Walk: Fifteen minutes at a time, up to one hour per day. Lift/Carry/Push/Pull: Up to ten pounds occasionally. Reach Above Shoulder Level: Never. Reach below Desk Level: Never. . . It is also noted the claimant's narcotics are affecting the claimant's cognition. The functional capacity reported by the providers is consistent with the medical data."

46. A 6/30/15 physical examination report by Dr. Lal again notes restricted range of motion and tenderness of cervical and lumbar spine, limited by pain. "Recommended Procedures: -SI Joint Injection (Side: both)." His 7/1/15 operative report references another bilateral sacroiliac joint steroid injection.

47. A 6/29/15 claim file entry by Ms. Lopez captioned "Peer Review Analysis" states, "Plan of Action: The functional capacity reported by the providers is consistent with the medical data. . . . Based on the completed review of the provided medical evidence, there was a functional impairment to support (employee) disability status, (employee) is medically supported."

48. A 6/30/15 claim file note by Ms. Lopez indicates that she sent the claim to her manager, Donna Kirkby, to review and sign off on her decision to overturn the claim denial. A 7/1/15 "Appeal Work Note" by Ms. Kirkby to Ms. Lopez states, "Manager reviewed case and agree with decision."

49. A 7/1/15 letter from Ms. Lopez to Plaintiff advised of the decision to overturn the denial of his STD claim, based on Dr. Rubin's review, who concluded that a *"functional impairment was supported. . . ."*

50. A very detailed 7/2/15 claim file entry by Ms. Lopez references the decision to overturn the STD denial and the "Decision Rationale" for doing so, which reflected a very clear understanding of Plaintiff's impairment and the objective medical examinations and MRIs, which supported the extent of that impairment, including his sitting restriction and the effect of a narcotic pain medication on cognition. The entry states, "Based on the medical documentation, all of the clinical abnormalities noted above . . . translate to the following restrictions and limitations: Sit: Fifteen minutes at a time, up to three hours per day. Stand/Walk: Fifteen minutes at a time, up to one hour per day . . ."

51. A 7/8/15 claim file entry by Ms. Ferrante indicates that she contacted Plaintiff to advise that his STD claim had been approved, as well as his LOA.

52. A 7/8/15 report of Randy Hobbs, references a physical therapy initial examination and notes "Cervical (Active Range of Motion) is decreased all directions except (right) rotation, hand behind back AROM decreased (right) more than (left), hand behind head . . . Hip internal rotation is decreased bilaterally. He is tender to palpation at area of supraspinous ligament at L2-3. SI joint mobility is

decreased into sacral flexion. Gluteals (soft tissue mobilization) decreased."

53. On 7/20/15, Dr. Singh noted, "Pain management is not really controlling his pain." "Still feel concentration is a problem." "Still struggles at keeping up with conversation."

54. On a 7/29/15 progress note of Dr. Chopan indicated no change in Plaintiff's condition.

55. An 8/7/15 "Nurse Consultant Clinical Consultant Review" by Peggy Rosier, RN, Aetna, states, "EE w/deficits of ROM and muscle function inability to sit for long periods, in active tx w/PMR. EE on prescribed medication that may cause drowsiness and affect cognitive functioning." "No Current Work Capacity."

56. An 8/18/15 letter report by Dr. Schnur states, "My patient, Marc A. Miller's back condition is felt to be a permanent and progressive condition and is unlikely to significantly improve in the foreseeable future. The current long-term plan is to manage the pain with hydrocodone / APAP, gabapentin and other pain modulators, as needed."

57. Claim file entries dated, 8/28/15, 8/31/15, 9/1/15, 9/10/15, and 9/14/15 indicate that after overturning its STD denial, Aetna continued to closely follow Plaintiff's medical treatment. They reflect ongoing claim management, receipt and analysis of medical records; no change in medical condition; no change in STD eligibility and ongoing approval of Plaintiff's STD claim to the STD end date of 10/1/15.

***"Own Occupation" LTD Benefit Eligibility and Determination***

58. Plaintiff became eligible for LTD on 10/2/15. An 8/10/15 claim file entry by Jannelle Zavala captioned "STD to LTD Transition Information" references a "Mailing Method: USPS". A second 8/10/15 claim file entry by Ms. Zavala captioned "LTD Packet Received" references receipt of an "LTD Packet", which included an Employee Statement, an Employer Statement, and an Attending Physician Statement".

59. On 8/10/15 an "LTD Claimant Interview" was done with Plaintiff by Melonee Ferguson, Disability Benefits Manager (DBM), Aetna.

60. An 8/13/15 Aetna claim file document by Ms. Ferguson, captioned "LTD Initial Assessment" recited the facts of the claim in detail, including the result of Dr. Rubin's "peer review".

61. On 8/22/15 Plaintiff completed a detailed "Aetna – Work History and Education Questionnaire". It stated that he was "unable to focus or concentrate due to pain and the medication" and that "the pain and pain medication interferes with my ability to concentrate and focus. It would not be prudent for me to manage clients' investments given my current physical and cognitive condition."

62. Claim file entries by Ms. Ferguson on 8/25/15 and 8/27/15 acknowledge receipt of information from Drs. Schnur and Chopan, as well as Physical Therapy progress notes from 7/10/15 -8/13/15". It states "documentation from 07/10/2015 PT note to most recent has no documentation change notes."

63. An 8/27/15 claim file entry by Ms. Ferguson states, "Plan of Action. Review claim for disability decision / refer claim to RMU (Risk Management Unit) ." Another entry by her on that date is captioned "RMU Referral". It states in part, "Reason Case is being referred: This claim has been identified as complex and the EE appears to only go to treatment or physicians in order to secure a favorable claim decision rather than seeking improvement. There is also a notation in a 7/31 (office visit note) which states the EE was sore from moving (furniture) yet he is unable to perform his own sedentary occupation."

64. Aetna's Risk Management Unit (RMU) is a department devoted to identifying, analyzing, evaluating and preventing loss exposures and monitoring risk control and financial resources to mitigate the adverse effects of loss, including financial risks such as the cost of claims. By its very nature, it performs a function that is profit-centered and non-fiduciary. See: *Metropolitan Life Ins. Co. v. Glenn*, 554 US 105, 128 S. Ct. 2343, 2351 (2008).

65. An 8/27/15 Aetna claim file entry captioned "RMU Confidential Review" states, "RMU Referral Accepted Yes." "Consider direction observation of the EE's activities."

66. An 8/28/15 claim file entry indicates the LTD claim was reassigned to Amy LaBrecque, "Senior Disability Risk Manager".

67. On 9/3/15 another "LTD Claimant Interview" was done with Plaintiff by Ms. LaBrecque.

68. A 9/3/15 Aetna claim file document indicates that there was a discussion between Ms. LaBrecque, a supervisor and a registered nurse. A "Plan" was described, which included conducting surveillance of Plaintiff.

69. A 9/17/15 Background Investigation Report was prepared by Claims Bureau USA, Inc., which stated details irrelevant to Plaintiff's LTD claim.

70. A 9/22/15 Surveillance Report by Claims Bureau USA, Inc. details surveillance of Plaintiff's activities, carried out over a three day period from 9/12/15 to 9/14/15. The surveillance resulted in 13 ½ minutes of videotape, showing absolutely nothing of any relevance to Plaintiff's LTD claim.

71. An undated letter in the Aetna claim file from Ms. LaBrecque to Sean Mullin, Human Resources, Bank of America, stated that Plaintiff's LTD claim *"has been denied effective 10/2/2015"*; and that Plaintiff had been *"notified, in writing, of this decision"*. Although the letter was not sent out, it appears that Ms. LaBrecque was holding it in her file in preparation for a contemplated denial of Plaintiff's claim, as early as 10/2/15.

72. Dr. Chopan's 9/30/15 Progress Note states, "Marc Miller has been a patient of mine for many years, has been dealing with persistent chronic back pain." "Unfortunately the effect of epidural injections are not lasting long enough. . . . . I told the patient that his back pain will be present for the rest of his life; he needs to deal with it. The plan at this time is to continue with physical therapy, epidural injections, pain medications, consider anti-depressants."

73. In a 9/30/15 APS, Dr. Chopan stated, “No sitting or standing (more than) 15 minutes, limited cognitive ability due to pain and pain management meds, impaired focus / concentration due to pain meds” and checked the box for “No Ability to Work”. In response to the queries, “Number of hours patient is capable of working in a day”, he checked the box for 2 hours; “Number of days per week patient is able to work”, he checked the box for 3 days; “Date you prescribed restriction on work activities”, he wrote, “4/2/2015”. “How long are these restrictions / limitations in effect?” He wrote: “Permanent”. “Objective findings”, he wrote “See attached LS Spine MRI”. In response to, “In your opinion is your patient motivated to return to work?” He wrote “Yes”.

74. A 10/6/15 “Clinical Consultant Referral” by Ms. LaBrecque states the file was sent for a “Complex Clinical Review” for the stated reason: “Review of inconsistent information, co-morbid conditions”. The form references the surveillance video and provided an internet link where it could be viewed. It states, “Appears EE would have the capacity to sustain the material duties of his own sedentary occupation with the ability to change position as needed for comfort.”

75. The “Complex Clinical Review” arranged by Ms. LaBrecque was not done by any medical doctor, but rather by a Registered Nurse. A 10/9/15 “Clinical Consultant Review” was done by Eleanor Newtown, RN, which concluded that Plaintiff “Has Work Capacity”. It states:

> “(T)here is no clinical evidence including objective exam findings of testing such as MMSE, neurocognitive testing or statements within medical records indicating cognitive impairment, inability to focus or concentrate as a side effect of medications. There are no restrictions or limitations including operating a motor vehicle. Claim observed activity driving with others in the vehicle.”
>
> “(T)here is no evidence of defined sitting/standing intolerance. This is self- reported and contrary to observation of activity on surveillance.”

"While the reports are primarily based subjective intolerance to pain there is no actual pain assessment available including VAS rating with and without medications or with change in position; claimant reports sleep disturbance with pain but no detailed information of aggravating or alleviating measures. . . . There is no indications of how often he is self medicating with hydrocodone and if it is effective. MRI on 5/11/15 finds degenerative disc disease with mild to moderate stenosis L2-S1 however radiologist noted there is no change or progression since last imaging on 11/18/13 and there is an absence of physical examination findings establishing clinical evidence of impairment. Claimant has work capacity."

76. There was a 10/16/15 "Roundtable/Case Conference" between Ms. LaBrecque and Maureen Brioso-Mesa, Behavioral Health Unit Clinical Case Manager. It was "confirmed" that Plaintiff's "anxiety and stress is secondary to physical limitations." It was decided to send an inquiry to Dr. Singh to "confirm if EE has had any neuropsych testing, confirm frequency of treatment and functional impairments - physical vs. psychological and confirm RTW plan and EE's motivation to RTW."

77. On 10/16/15 Ms. LaBrecque called Plaintiff to inform him that Aetna would "need to extend LTD claim determination". She advised that a Clinical Consultant Review indicated a "lack of clinical evidence to support impairment for cognitive condition as well as chronic back pain condition." Although she and Ms. Brioso-Mesa had determined that neuropsychological testing was needed, she did not mention to Plaintiff any specific need for such testing. Instead, she merely told him that "cognitive assessment is important".

78. Ms. LaBrecque sent a 10/16/15 letter to Plaintiff, which set forth an assessment of his LTD claim, based on a review of medical records by Nurse Newtown. The letter pointed to an absence of neurocognitive testing and indicated that Aetna's Clinical Consultant disagreed with Dr. Chopan's sitting and standing

restrictions, because they were said to be "based on subjective intolerance to pain"; and the consultant noted that the 5/5/15 MRI showed "no change or progression since the last imaging of (11/18/13)". The letter stated that "an outreach for clarification" had been made to Dr. Chopan.

79. On 10/16/15 Ms. LaBrecque sent identical letters to Drs. Chopan, Schnur and Donald Miller, which referenced the private investigation report, as well as a link to the "corresponding surveillance footage". The letter purported to describe Plaintiff's activities "observed" during the surveillance. The letter described Plaintiff's occupation as "sedentary physical demand level work as defined by the Dictionary of Occupational Titles (DOT)". It recited the findings of Nurse Newtown and invited each doctor to respond, to provide "clarification", by answering three "Yes" or "No" questions: "1. Do you find the person observed in the surveillance footage to be your patient, Marc Miller? 2. Based on your review, is Mr. Miller capable of performing fulltime sedentary physical demand level work? If no, please provide the medical basis for your opinion. 3. Are you aware if Mr. Miller has undergone any neuropsychiatric or neurocognitive evaluations?" The letter concluded, "Please respond no later than October 23, 2015 as we may render a final determination with the information on file at that time."

80. Dr. Singh sent a 10/19/15 response letter to Aetna, which stated, "Patient has not been referred to neurologist by me. This is deferred to his primary care MD." "Primary disabling condition is medical (pain), with secondary sequelae (psychological), including anxiety, mood swings, and memory / concentration problems likely contributing to disability."

81. Dr. Schnur sent a 10/20/15 response to Aetna, which said that Plaintiff would be physically capable of performing full time "sedentary physical demand level" work; and that he was not aware of any neurocognitive evaluations done.

82. A 10/26/15 claim file entry" by Ms. LaBrecque references a referral for a vocational review by Heili Randall. It states, "Referral Reason: DOT

Lookup". "Please review (Job Description) and confirm the DOT including PDL (Physical Demand Level) for the occupation of Senior Financial Advisor."

83. A 10/27/15 "Occupation Analysis" by Ms. Randall states: "it appears that the Employee's job most closely correlates to the following occupation: Title: Financial Planner. DOT Code: 250.257-014. Specific vocational preparation: 8. Strength: Sedentary. ONET: 41-3031-01. Sales Agents, Securities and Commodities. . . . The PDL for this occupation is Sedentary."

84. A 10/28/15 Aetna claim file entry by Ms. LaBrecque captioned "LTD Disability Determination" states that "objective / clinical findings" did not support "ongoing disability"; that Plaintiff was not "disabled per plan / policy definition of disability"; and that he "has work capacity". It described his occupation as "sedentary" and again noted "no neuropsychiatric or neurocognitive testing has been performed to support any cognitive dysfunction and/or inability focus or concentrate related to the medications EE is taking." It states the conclusion: "Clmt not precluded from performing own occ. based on medical review and direct observation." "Comments (Senior Technical Specialist) agrees with decision to deny claim based (on Clinical Consultant Review) and surveillance lack of objective medical evidence to preclude EE from performing sedentary occ."

85. A 10/28/15 Aetna claim file entry by Ms. LaBrecque references a phone contact with Plaintiff. She informed him that his LTD claim would be denied. She stated, "Dr. Schnur has provided a response in agreement w/our assessment of your capability to perform sedentary work." She said, "you have not had any neuropsych testing to confirm any cognitive deficits". Plaintiff replied ***"****if he had known what tests were needed, he would have had them*". She then *"(Advised Mr. Miller it was not her) role to (advise) of treatment and tests, that would be the role of his treating providers."*

86. A 10/28/15 letter report from Dr. Donald Miller to Ms. LaBrecque responded to her questions about the surveillance observations, as well as the

conclusions of Aetna's "clinical consultant". He explained, how Plaintiff's observed activities were not inconsistent with his impairment. He stated in part:

> "There is abundant evidence of chronic pain substantiated by . . . abnormal EMG studies and multiple abnormal MRI exams. . . . . " "It is also my medical opinion that your clinical consultant cannot accurately determine whether Mr. Miller is capable of making important financial decisions in respect to his client's financial pictures while utilizing narcotic analgesics throughout his working day. . . . I certainly would not want to depend on an individual who is taking narcotic medication throughout the day to determine how I would invest my money . . ."

87. Plaintiff's LTD claim was formally denied by a 10/29/15 letter from Ms. LaBrecque, which described the surveillance "observations"; it pointed to an absence of "neuropsychiatric or neurocognitive testing"; it characterized his occupation as "sedentary", as per the DOT; it referenced the review by Nurse Newtown and concluded: "Overall, our medical assessment has concluded the available clinical evidence does not support a physical, psychological or cognitive impairment which would preclude you from performing the material duties of your own occupation as a Financial Advisor on a full-time basis. . . ."

88. An 11/2/15 Aetna claim file entry by Ms. LaBrecque indicates that she asked Nurse Newtown to review the responses from Drs. Schnur and Miller, as well as the physical therapy records and advise if the new medical information altered her previously stated conclusion. Ms. Newtown responded by an 11/3/15 "Clinical Consultant Review", which referred to Dr. Donald Miller's report as an "advocacy statement" and stated that he provided "generalized statements regarding pain". She stated that his report did not alter her prior conclusion and she noted that "Dr. Schnur responded that claimant has (full time) work capacity."

89. An 11/3/15 response from Dr. Chopan stated that Plaintiff would not be capable of "performing full time sedentary physical demand level work" for the

stated reason that *"His pain is intermittent in nature. At times he can sit for few hours but not every day."*

90. Dr. Chopan's 11/3/15 Progress Note states: "Patient is in a lot of pain today. . . . I think his insurance company is treating him unfairly because his pain is intermittent. He has been getting epidural injection to get pain relief, and when he has epidural injection that he can do things better for a few days, but then his pain returns and impairs his ability to function. And he needs to take narcotics to reduce his pain and that interferes with his judgement and his ability to make sound decisions."

91. An 11/4/15 "Analysis/Review Medical Records" by Ms. LaBrecque. acknowledged receipt of Dr. Chopan's response and stated, "No additional medical exam findings or office treatment records have been provided to support Dr. Chopan's rationale as to why the EE cannot perform full-time sedentary PDL work. Response to narrative does not alter prior claim determination as there is no additional medical evidence provided for consideration."

92. Two letters from Ms. LaBrecque to Plaintiff dated 11/4/15 acknowledged receipt of the responses from Drs. Donald Miller and Chopan. Each letter stated, *"The additional information was reviewed and is not sufficient to warrant a reversal of your disability claim decision at this level."*

***Administrative Appeal of Benefit Termination***

93. Plaintiff's attorney, Michael McKuin sent an 11/10/15 letter to Aetna and Bank of America, requesting the claim file and all pertinent plan documents. On 11/25/15 he received an 11/18/15 letter from Ms. LaBrecque, accompanied by two compact disks, one containing the Aetna LTD claim file, consisting of 488 pages and the other containing approximately 13 ½ minutes of video surveillance.

94. Mr. McKuin received a 12/11/15 letter from Ms. LaBrecque, accompanied by the Aetna "Certificate" and "Summary of Coverage". No documents were received from Bank of America.

95. In reviewing the LTD claim file, Mr. McKuin found various references to documents pertaining to the STD claim investigation and determination, including Dr. Rubin's 6/19/15 "peer review" report, which were missing from the LTD file that Aetna had produced. Therefore, he sent a 1/4/16 letter to Ms. LaBrecque, which requested that Aetna, "immediately produce an entire copy of the STD file, as well as any and all other documents that there may be that are related in any way to Aetna's LTD investigation and determination."

96. On 1/12/16, Mr. McKuin received a letter dated 1/5/16, accompanied by a CD, purported to contain the Aetna STD file, consisting of 398 pages.

97. By letter dated 4/1/16 to Aetna and the Bank of America Corporate Benefits Committee, Mr. McKuin requested a final administrative review "by the appropriate named fiduciary of the decision denying the claim", pursuant to 29 USC § 1133(2) and 29 CFR 2560.503-1 (h) and (i). In support of the appeal, he submitted documents, some of which were referenced in the STD and/or LTD claim files, but not found in either file. He also submitted an 11/16/15 report of Ben Waldau, MD (Neurologist); an 11/17/15 X-Ray Lumbar Spine report; a 1/6/16 letter from Dr. Schnur; a 3/9/16 Neuropsychological Evaluation Report of John S. Miller, Ph.D.; a 3/25/16 Vocational Report of Howard Goldfarb, and an excerpt from Aetna's 2002 Claims Manual entitled, "Fair and Unfair Claim Practices".

98. Dr. Waldau's 11/16/15 report identified "Modic changes at L5 – S1, and there is also disc desiccation at several other levels."

99. The 11/17/15 X-Ray showed "Moderate disc space loss at L5-S1 with large osteophytes."

100. Dr. Schnur's 1/6/16 letter report stated, "Given Mr. Miller's restrictions and limitations, he would be incapable of reliably and consistently performing the material duties of his high-stress job as a Financial Advisor."

101. The 3/9/16 report of John S. Miller, Ph.D. states, "This evaluation has found numerous examples of cognitive, emotional, personality and attentional

deficits." The report goes into great detail as to the underlying basis for Dr. Miller's conclusions. The report states, "Given Mr. Miller's job requirements . . . it would appear difficult for him to meet the demands of his job."

102. Mr. McKuin's appeal letter addressed the Plan provisions governing the determination of "disability"; the stated grounds for the initial denial of the claim; and the medical and vocational evidence in support of Plaintiff's disability. and the reasons why Aetna's handling of the claim was procedurally deficient.

103. Mr. McKuin received a 5/3/16 letter from Kimberly Marion Young, stating that Aetna had Plaintiff's file reviewed by an unidentified physician, specializing in Occupational Medicine; that an "opinion report" had been prepared by that physician and sent to Dr. Lal for a response within ten days. It further stated, *"So that Dr. Lal has time to review the report, I'm placing the appeal review on hold until I receive any additional information. This is called Tolling"*

104. Mr. McKuin sent a 5/11/16 letter to Ms. Young, which explained that the federal regulations require determination of an appeal within 45 days, absent "special circumstances" and provide for "tolling" of the prescribed time period, only "due to a claimant's failure to submit information necessary to decide a claim" [29 CFR 2560.503-1(i)(4)] ; and since no such "failure" existed, no "tolling" was allowed and, thus, a timely response to the appeal was due on or before 5/19/16.

105. Mr. McKuin's 5/11/16 letter requested that Aetna produce a copy undisclosed "opinion report", "as well as any other such report(s) or other evidence in your possession that has not yet been disclosed and provide a reasonable opportunity to review and respond to the same before any further adverse decision is made on Mr. Miller's claim, based on such reports or evidence."

106. Mr. McKuin received a 5/13/16 letter from Ms. Young (postmarked 5/16/16) , which stated that a copy of the "opinion report" had been also sent to Drs. Chopan and Schnur, with a request that they "review" it and state "if they disagreed with any area of the opinion" and if so to "respond in writing". The

letter asked that Mr. McKuin contact Drs. Chopan and Schnur to "ensure that they review the medical opinion and respond accordingly by May 17. 2016," which would have been impossible to do, as the letter was not received until 5/20/16.

107. Ms. Young's letter stated that Aetna's review of the appeal has been "placed on hold until May 17, 2016", which presumably meant that Aetna's unlawful "tolling" of the review, which started on 5/2/16 was to end on 5/17/16; thus, giving Aetna a two week extension to respond to the appeal (i.e. on or before 6/2/16). Her letter stated that "A copy of the physicians report can be provided to you upon the completion of our appeal determination at your request."

108. Mr. McKuin directed a 5/24/16 letter to Ms. Young, which stated that her request to Drs. Chopan and Schnur was overbroad. It further stated:

> "(A)ll of Marc Miller's treating, examining and reviewing physicians have made it abundantly clear in writing for the record what their opinions are as to his restrictions, limitations and level of impairment. If there is anything contained in any of their reports that Aetna does not understand, please direct your questions or requests for clarification to me and I will in turn do my best to respond or obtain a response . . ."

109. With regard to the refusal to produce a copy of the undisclosed "opinion report", Mr. McKuin's 5/24/16 letter invited attention to 29 CFR 2560-503-1 Subsection (h)(2)(iii), which provides that a claimant may request copies of all 'relevant' documents from a plan." Mr. McKuin's letter also recited the requirement of 29 USC §1133(2) requires that every employee benefit plan "shall . . . (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." And his letter also cited numerous cases holding that disclosure of information is required for a "full and fair review".

110. Mr. McKuin directed a 6/16/16 letter to Ms. Young, which stated, "Aetna is 26 days past the time fixed by the federal regulations for responding to

my appeal (5/21/16) and 12 days past its own extended deadline (6/4/16)."

***Upholding of Initial Denial by Aetna***

111. On 6/17/16, Mr. McKuin received a letter from Ms. Young, dated 6/10/16 and postmarked 6/13/16. The letter contained nothing of any substance. It merely stated that Aetna had "completed our review of your client's appeal of the denial of his LTD benefits. For the reasons detailed below, the original decision to deny LTD benefits, effective April 3, 2015, has been upheld." Aetna's decision upholding the denial of Plaintiff's LTD claim, was again based on a finding that Plaintiff was not impaired from a "sedentary" demand level occupation, without regard to the cognitive demands of his actual occupation or the cognitive deficits, identified by Dr. John Miller, which prevent him from performing the duties of that occupation. Aetna's conclusions were also apparently based on the undisclosed report of a reviewing physician, who specializes in Occupational Medicine, as well as a second undisclosed report by a reviewing neuropsychologist.

***No Reservation / Delegation of Discretion; Standard of Review***

112. Plaintiff is not aware of any provision in any plan document that either: (a) reserves discretion to the plan administrator to determine eligibility for benefits or to construe the terms of the plan; (b) provides any procedure for delegating any such discretion; or (c) purports to confer any such discretion upon Aetna. Accordingly, the applicable standard of review in this case is the *de novo* standard, pursuant to *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989).

113. To the extent that there is any plan provision reserving or delegating any such discretion to Aetna, it would be invalid under California state law. See: California Insurance Code § 10110.6(a).

***Conflict of Interest and Standard of Review***

114. If for any reason, the applicable standard of review in this case is the "abuse of discretion" (or deferential) standard, Aetna had an inherent and

substantial conflict of interest, by virtue of the fact that it was both a fiduciary and a funding source of the Plan. Therefore, that conflict of interest must be weighed as a factor in determining if it abused that discretion. See: *Metropolitan Life Ins. Co. v. Glenn* 461 F. 3d 660 (2008); *Abatie v. Alta Health & Life Insurance Company*, 458 F.3d 955 (9th Cir. 2006).

115. There are a number of substantive and procedural factors that are to be weighed under an *"Abatie / Glenn"* analysis, which in this case demonstrate Aetna's self-interested decision-making and its clear abuse of discretion.

***Inadequate Communication Regarding the Claim***

116. Aetna meticulously managed Plaintiff's STD claim to a point where he was compelled to see doctors more often than usual, gathering redundant medical reports in order to provide Aetna with ongoing proof of eligibility on a monthly, bi-weekly or even weekly basis. But then, the very fact that he had provided such reports evoked sarcastic criticism, when his LTD claim was under initial review. (See: 8/27/15 claim file entry by Melonee Ferguson).

117. When Plaintiff became eligible for LTD, he was compelled to start over again from scratch to prove what he had already proven to Aetna time and time again. However, at that point in the process, it was suddenly Aetna's unarticulated expectation that he would also provide it with unspecified neuropsychological test results at his own expense.

118. During his 10/28/15 phone conversation with Ms. LaBrecque, Plaintiff told her that "*if he had known what tests were needed, he would have had them"*. Ms. LaBrecque responded that it was not her *"roll"* to tell him about needed tests. Under ERISA, the regulations and the case law of this Circuit, it most certainly was Aetna's *"roll"* to advise of any tests needed, if a favorable claim determination depended on the existence of such tests. *Booton v. Lockheed*, 110 F.3d 1461, 1463 (9th Cir., 1997) ("(I)if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is

nothing extraordinary about this; it's how civilized people communicate with each other regarding important matters.").

119. Ms. LaBrecque's 11/4/15 claim file entry, as well as her letter of that date to Plaintiff faulted Dr. Chopan's 11/3/15 response to her 10/16/15 letter for not providing *more* information, stating *"No additional medical exam findings or office treatment records have been provided to support Dr. Chopan's rationale as to why the EE cannot perform full-time sedentary PDL work."* However, her 10/16/15 letter did not ask that Dr. Chopan provide any *"additional"* exam findings or records to *"support his rationale"*. It simply asked that he respond to the question and that he provide a *"medical basis"* for his opinion, which he did.

120. Ms. Labrecque's 10/29/15 letter denied the claim in part, based upon an alleged "absence of physical examination findings establishing clear evidence of impairment" and absence of neuro-cognitive testing that it never requested, nor arranged. To deny a claim based on a lack of information never requested is contrary to the case law of this Circuit. *Booton v. Lockheed*, supra.

121. Plaintiff diligently tried to provide whatever information Aetna needed. But rather than specify what information it needed, Aetna preferred to point to an alleged *absence* of information that he allegedly *failed* to provide. In addition, the 10/29/15 initial denial letter made a generalized statement that "the available clinical evidence does not support" impairment. See: *Salomaa v. Honda Long Term Disability Plan* 642 F.3d 666, at 680 (9th Cir., 2011). ("An administrator does not do its duty under the statute and regulations by saying merely 'we are not persuaded' or 'your evidence is insufficient'").

122. There was no effort made by Aetna to engage in any "meaningful dialogue" with Plaintiff, before denying his claim. Such inadequate communication is a factor to be considered in determining whether Aetna's self-interest actually caused a breach of its fiduciary obligations. See: *Friedrich v. Intel Corporation;* 181 F.3d 1105 (9th Cir., 1999).

***Denial is Based On Erroneous Findings of Fact***

123. "'(I)t is an abuse of discretion for an ERISA plan administrator to make a decision . . . that is based on clearly erroneous findings of fact.'" *Snow v. Standard Insurance Company* 87 F.3d 327, 331-332 (9th Cir., 1996)), quoting *Atwood v. Newmont Gold Co.,* 45 F.3d 1317, at 1323-24 (9th Cir 1995) and *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, at 1472-73 (9th Cir. 1993)).

124. As early as 7/1/15, Aetna found that Plaintiff met the STD definition of "disability", which is "virtually identical" to the "Own Occupation" LTD definition; and yet, Aetna found "no disability" at all at a later date, despite the fact that there had been no improvement in in Plaintiff's medical condition, nor any other change of circumstance. That defies logic and common sense. Such a practice also runs contrary to the law. See, e.g.: *Montour v. Hartford Life & Accident Ins. Co.,* 588 F.3d 623, 635 (9th Cir. 2009); *Saffon v. Wells Fargo & Co. Long Term Disability*, 522 F. 3d 863, 871 (9th Cir., 2008).

125. The 10/29/15 LaBrecque denial letter characterized Plaintiff's occupation as merely "sedentary". The "Occupation Analysis" relied upon to support that consisted of nothing more than looking up the job title for "Sr. Financial Advisor' in the DOT, and reciting that the position was "sedentary" in terms of strength demands. Physical demands and strength ratings only reflect <u>part</u> of an occupational assessment, not the entirety of it. It is not a comprehensive assessment of the *actual* demands of an occupation that are not related to strength. Thus, the vocational assessment relied upon by Aetna was flawed and unreliable.

126. An insurer must consider the <u>actual job duties</u> performed by a claimant and may not rely exclusively on general occupational descriptions, such as those found in the DOT or even the O*NET. See: *Dionida v. Reliance Standard Life Ins. Co.*, 50 F. Supp. 2d 934 (N.D. Cal. 1999). Aetna's policy provides that "disability" means an inability to perform the "material duties of your own occupation". Material Duties are defined in the policy as "duties that are normally

required for the performance of your occupation and cannot be reasonably omitted or modified". The policy further provides that "Own Occupation. . . is the occupation that you are routinely performing" when the disability began. "Your occupation will be viewed as it is normally performed in the national economy."

127. Although the extent of Plaintiff's impairment had been recognized and acknowledged by Aetna personnel, the 10/9/15 review by Nurse Newtown stated her conclusion that there was a sudden existence of "work capacity" on Plaintiff's part. That conclusion was not based on anything she saw or reviewed, but rather on the alleged absence of things she said she did not see.

128. Nurse Newtown stated that there was no "evidence of defined sitting / standing intolerance". But Dr. Chopan had clearly "defined" that limitation on several occasions (5/4/15, 9/30/15) ("no sitting or standing (more than) 15 minutes."). Drs. Miller and Rubin concurred in their reviews of 6/1/15 and 6/19/15. Physical Therapist, Randy Hobbs, also noted on 7/8/15 that sitting more than 15 minutes increases pain. Beyond physical examination, it is not clear what kind of "evidence" Nurse Newtown required to precisely "define" this limitation.

129. Nurse Newtown stated that Plaintiff's sitting limitation was "self-reported." That ignored his clear medical history, as well as the evidence of multiple MRIs and EMG tests.

130. Nurse Newtown concluded there was "no clinical evidence including objective exam findings of testing such as MMSE, neurocognitive testing <u>or statements within medical records</u> indicating cognitive impairment, inability to focus or concentrate as a side effect of medications." However, Dr. Chopan's 9/30/15 APS noted "limited cognitive ability due to pain and pain management meds, impaired focus / concentration due to pain meds and his 5/4/15 Progress Note said, "I strongly believe that the amount of Norco he takes to control his pain . . . will definitely affect his ability to (counsel) his client properly." So, there were in fact "statements within medical records indicating cognitive impairment".

131. Nurse Newtown pointed to a notation made by a radiologist that a 5/11/15 MRI indicated “no change or progression since last imaging on 11/18/13”. Both Drs. Miller and Rubin noted significant changes between those two MRIs. Ms. LaBrecque’s own 9/3/15 claim file entry states, “MRI's do show progression of disease.” But she nevertheless elected to rely on the flawed “denial-friendly” review by Nurse Newtown.

132. According to Ms. LaBrecque’s 10/28/15 claim file entry, she told Plaintiff that “Dr. Schnur has provided a response in agreement w/our assessment of your capability to perform sedentary work.” She reiterated that sentiment in her 10/29/15 denial letter. Dr. Schnur did not “agree” with any such “assessment” by Aetna. Dr. Schnur has clearly stated in his 1/6/16 letter that, “Given Mr. Miller's restrictions and limitations, he would be incapable of reliably and consistently performing the material duties of his high-stress job as a Financial Advisor.”

133. Aetna also exaggerated and overstated the surveillance. In her 10/16/15 letters to Drs. Chopan, Schnur and Miller, Ms. LaBrecque said that Plaintiff was observed bending over, reaching overhead and lifting “approximately five gallons of gasoline from floor to waist height. Mr. Miller is then observed walking . . . back to the vehicle carrying a case of beer in his left hand . . .” However, he was not seen carrying a “case of beer”, nor was he seen lifting a “five gallon” gas container. He was observed carrying an 18-pack of beer, which weighs 13.5 lbs. and lifting a one gallon gas container, which weighs 6 lbs.

***Denial of Claim is Contrary to Plain Language of Plan***

134. Ms. LaBrecque’s 10/16/15 letter to Plaintiff parroted Nurse Newtown’s 10/9/15 conclusion that there was an absence of neurocognitive testing to support a cognitive impairment and “no evidence of defined sitting and standing tolerance and the reports are primary based on subjective intolerance to pain.” Therefore, Dr. Chopan’s sitting restriction was said to be unsupported.

//

135. During her 10/28/15 phone contact with Plaintiff Ms. LaBrecque said that "if his condition was severe / significant enough to impact functionality, the testing and/or exam findings should be documented in the records."

136. The reasoning employed and the remarks thus made, erroneously assume and suggest that there is some kind of an objective examination finding that demonstrates the existence of debilitating pain. But the degree of pain one experiences is inherently immeasurable. Since pain cannot be observed, it is not always susceptible to demonstration or objective documentation.

137. Nothing in the policy requires a specific objective finding to support intensity or frequency of pain, nor was Plaintiff or his treating physicians ever told what quantum of proof would be needed by Aetna to satisfy such a vague standard. Insurers may not inject such additional terms into their policies. The retroactive imposition of such vague terms deprives the insured of any ability to know ahead of time what proof is required by the Plan. *Saffle v. Sierra Pacific Power Company Bargaining Unit Long Term Disability Income Plan* 85 F.3d 455, 459-460 ; (9th Cir., 1996); *Canseco vs. Construction Laborers Pension Trust for Southern California* 93 F.3d 600, 608 (9th Cir. 1996).

138. Subjective claims of pain need not be supported by objective medical evidence. Rather, there must be a medically determinable impairment that reasonably can be expected to produce such symptoms. *Ace v. Aetna Life Ins. Co.*, 139 F.3d 1241 (9th Cir. 1998); *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 635 (9th Cir. 2009). *Saffon v. Wells Fargo & Co. Long Term Disability*, 522 F. 3d 863, 872 (9th Cir., 2008).

139. If subjective evidence is credible and relevant, it should not be discounted by the fiduciary, when conducting an ERISA-mandated claim review. For the foregoing reasons, to the extent that Aetna's denial was based on a lack of objective evidence, it was an abuse of discretion.

//

***Plaintiff's Claim is Supported by "Substantial Evidence"***
***Defendant's Denial is Not***

140. Even under a *deferential* standard, a decision of the Plan, denying a claim, must be supported by *"substantial evidence"* in the record. *Sandoval v. Aetna Life and Cas. Ins. Co.,* 967 F.2d 377, 382 (10th Cir. 1992). *Madden v. ITT Long Term Disability Plan,* 914 F.2d 1279, 1285 (9th Cir. 1990).

141. The medical records and reports very clearly show that Plaintiff has experienced varying degrees of pain since his 1995 injury. A 5/27/10 MRI noted "moderate degenerative disc disease at L2-3 and L5-S1 and mild degenerative disc disease at L4-L5", "bilateral neural foraminal narrowing at L5-S1 and L4-5", as well as "possible impingement on the exiting left L5 nerve root."

142. Dr. Chopan has stated that Plaintiff's persistent, severe pain, affects his ability to function; Dr. Chopan and Dr. Donald Miller have both opined that narcotic pain medication impairs his judgment and ability to make sound decisions; Dr. Schnur has likewise said that given his restrictions and limitations, Plaintiff would be "incapable of reliably and consistently performing the material duties of his high-stress job as a Financial Advisor."

143. Aetna conducted no neuropsychological testing of Plaintiff, while simultaneously faulting him for not obtaining such testing at his own expense. When such testing was ultimately done by Dr. John Miller, (at Plaintiff's expense) it revealed found "numerous examples of cognitive, emotional, personality and attentional deficits . . . it would appear difficult for him to meet the demands of his job." Aetna simply ignored those findings.

144. Vocational expert, Howard Goldfarb, concluded that, given the requirements of his highly skilled occupation, Plaintiff "clearly cannot engage in his position as a Senior Financial Planner."

145. Dr. Donald Miller has opined that Plaintiff's condition will only get worse.

146. Dr. Chopan has opined that he might be able to return to modified duty in about a year but would never be able to return to full duty.

147. Not a single medical doctor has even suggested that Plaintiff will be able to return to work anytime in the future.

148. Aetna's own reviewing nurse, Peggy Rosier, RN noted in August 2015 that Plaintiff has "No Current Work Capacity".

149. Aetna's own reviewing Orthopedic Surgeon, Dr. Stuart Rubin, stated that "the clinical abnormalities discussed above, translate to the following restrictions and limitations: Sit: Fifteen minutes at a time, up to three hours per day. Stand / Walk: Fifteen minutes at a time, up to one hour per day."

150. In evaluating Plaintiff's LTD eligibility, Aetna elevated the ill-grounded opinion of a single Registered Nurse, Eleanor Newtown, above those of two other Aetna nurses, who expressed a contrary opinion, as well as four practicing specialists, who have more than 100 years' of collective experience, two of whom are treating physicians.

151. Although the opinion of a treating physician is not entitled to any special *deference*, given the Supreme Court's decision *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003), the Court stated very clearly in that unanimous opinion that: "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Moreover, it is well established that the opinions of treating physicians, which are based upon direct examination and clinical findings, are to be accorded greater weight than those of an examining physician and considerably more weight than those of reviewing physicians or nurses. See, e.g. *Monroe v. Pacific Telesis Group*, 971 F. Supp. 1310, 1315, (CD Cal, 1997), *Donaho v. FMC Corporation* 74 F.3d 894, 901 (8th Cir.,1996); *Pierce v. American Waterworks Company, Inc.* 683 F. Supp. 996, 1001 (WD, Penn., 1988); and see*: Newcomb v. Standard Insurance Co.* 187 F.3d 1004 (9th Cir. 1999).

152. Given the state of the evidence in the administrative record, it is obvious that Aetna hasn't merely "refused to credit" Plaintiff's reliable evidence. It has ignored a voluminous amount of reliable evidence, including the reports of its own physician and reviewing nurses, while basing its claim denial upon a scant paper review by Nurse Newtown, which itself relied upon surveillance observations that were incorrect or irrelevant and a flawed vocational assessment.

153. Ms. LaBrecque's 10/16/15 initial denial letter was little more than a wholesale regurgitation of the stated findings of Nurse Newtown.

154. Ms. Young's 6/19/16 final determination letter was presumably based on two additional undisclosed reports of two unidentified reviewing physicians, who have no direct familiarity with Plaintiff. Accordingly, Aetna's total reliance upon such opinions (to the exclusion of all other evidence, especially the opinions of examining and treating physicians, who have demonstrated an intimate familiarity with Plaintiff) was a clear abuse of discretion.

155. There is no reliable vocational evidence in the administrative record, supporting a denial. Nothing in the record establishes that Plaintiff can perform the material duties of his own occupation; nor is there any competent, reliable evidence to indicate that Plaintiff can perform the material duties of "any occupation", as defined by the Plan. Nothing in the record establishes that any prospective employers in any identified job category would be willing to hire a person with Plaintiff's problems.

***No Diligent Investigation***

156. Aetna characterized Dr. Schnur's 10/20/15 response to its 10/16/15 three-question query, as being *"in agreement with our assessment"*. But his response was not *"in agreement"* with any such *"assessment"* at all, as is shown by his 6/8/15 and 8/18/15 letters. If Aetna truly believed Dr. Schnur had changed his opinion, then that would present a clear inconsistency that Aetna would need to resolve if its investigation were legitimate. At a minimum Ms. LaBrecque should

have inquired further into the reason for this presumed inconsistency. But no effort was made.

157. Aetna also made no significant effort to competently investigate and ascertain what the "material duties" of Plaintiff's high stress and demanding occupation are. Instead, it simply plucked an occupational definition from the DOT and trotted it out as an allegedly apt description of his material duties (as merely sedentary) and then it sought medical reviews from its own in-house Registered Nurse, which relied upon that flawed vocational assessment.

158. Nurse Newtown stated that there was "an absence of physical examination findings establishing clinical evidence of impairment", prompting Dr. Donald Miller to remark, "There is abundant evidence of chronic pain substantiated by the aforementioned abnormal EMG studies and multiple abnormal MRI exams. What more evidence does your consultant need - there are extremely well documented subjective complaints that are absolutely substantiated by extensive objective evidence." In addition, Dr. Chopan's 4/20/15 APS noted objective findings of tenderness; the 7/8/15 Physical Therapy Initial Examination Report of Randy Hobbs noted "Objective . . . Range of Motion"; On Dr. Chopan's 9/30/15 APS, under "Objective findings", he wrote "See attached LS Spine MRI"; and the 7/8/15 entry captioned "STD Reinstatement" by Hope Ferrante stated, "Do objective/clinical findings support ongoing disability? Yes."

159 Plaintiff submitted medical reports, including examination reports obtained over a very long period of time, which were supportive of his claimed impairment. The reports of many of those same physicians were in fact considered sufficient to establish his total disability from his own occupation for purposes of the self-funded STD benefits. If there was any doubt as to the accuracy or completeness of the information he submitted, Aetna could have had him examined by physicians of its own choice, rather than base a denial on an alleged absence of unspecified examination findings. However, it failed to do that. See:

*Salomaa v. Honda Long Term Disability Plan* 642 F.3d 666, 671 (9th Cir., 2011).

160. The Aetna LTD policy provides, "Examinations and Evaluations. Aetna will have the right and opportunity to examine and evaluate any person who is the basis of any claim at all reasonable times while that claim is pending or payable. This will be done at Aetna's expense."

161. Aetna did not arrange for any kind of neurocognitive testing or any other type of examination, although it had the right to do so under the policy. Instead, it faulted Plaintiff for not conducting such testing at his own expense.

162. Nurse Newtown also stated that there was no "objective exam findings of testing such as MMSE, neurocognitive testing" to support Plaintiff's cognitive impairment due to narcotic pain medication.

163. The 10/29/15 initial denial initial denial letter stated that Plaintiff might wish to undergo (at his own expense) and submit with his appeal "MMSE neurocognitive testing (including validity testing)". But when Plaintiff actually did this and submitted a neuro-psychological evaluation by Dr. John S. Miller, Aetna completely ignored without comment the results of the very testing that it previously said was *so* important.

164. Accordingly, Aetna preferred to point to an alleged absence of evidence never obtained or requested, rather than conduct a diligent investigation to ascertain the facts.

165. During the impermissibly extended period that Aetna took to respond to Mr. McKuin's appeal, it conducted no diligent investigation of the grounds set forth in his 4/1/16 appeal letter. Instead, Aetna merely sought to shore up the initial denial with additional review reports, which it has not disclosed as of the date of the filing of this Complaint.

***Selective Review and Biased Decision-making***

166. Aetna had a fiduciary duty under ERISA to consider all of the evidence made available to it.

167. It was unreasonable for Aetna personnel to disregard the contents of the 398 page STD file that it had assembled. The STD file was absolutely relevant to the LTD claim: The claimant was the same; the claims administrator was the same; the medical history was the same; the impairment was the same; the medical condition giving rise to the impairment was the same; the medical records that would substantiate that impairment were the same; and the definitions of STD and "Own Occ." LTD "disability" are virtually identical.

168. On 8/13/15, Ms. Ferguson conducted an "LTD Initial Assessment". At that point it was her plan to process the LTD claim and make an LTD eligibility determination. Between 8/10/15 and 8/27/15 Ms. Ferguson set about the task of interviewing Plaintiff, sending out a letter to Plaintiff, obtaining updated medical information, and obtaining a questionnaire from Plaintiff.

169. Two weeks later, on 8/27/15, Ms. Ferguson inexplicably referred Plaintiff's claim to Aetna's "Risk Management Unit", where it was thereafter handled by Ms. LaBrecque. The stated reason for this referral was because, *"This claim has been identified as complex and the EE appears to only go to treatment or physicians in order to secure a favorable claim decision rather than seeking improvement."*

170. Plaintiff's LTD claim was no more complex than his STD claim, nor for that matter was it more complex than any other LTD claim. The only thing that sets Plaintiff's claim apart from other LTD claims is the high dollar amount of the claim. Aetna's Risk Management Unit does not exist for the purpose of handling "complex" LTD claims. It exists for the purpose of evaluating and preventing loss exposures (i.e. increasing company profit).

171. Although there had been no change in Plaintiff's medical condition, there was suddenly a profound change in Aetna's assessment of his impairment. As soon as his claim was transferred to the Risk Management Unit, Aetna personnel set about the task of laying groundwork to deny his LTD benefits.

172. Ms. LaBrecque's 10/16/15 letters to Drs. Chopan, Schnur and Miller posed three "Yes / No" questions for each doctor to respond to. The purpose of the letter was not to honestly seek information or enlightenment, as demonstrated by the fact that each doctor was told that he would only have seven days to respond.

173. Dr. Miller would respond on 10/28/15 with a very detailed response. Dr. Chopan would respond on 11/3/15. Both responses were submitted prior to Ms. LaBrecque's arbitrary 11/13 deadline; however, Aetna had already issued its premature denial on 10/29/15, based on what it perceived as a "denial-friendly" response from Dr. Schnur on 10/20/15.

174. Ms. LaBrecque's 10/29/15 initial denial letter also latched onto the suspect "paper review" findings of Nurse Newtown, to the exclusion of all other medical evidence supporting Plaintiff's claim, which demonstrates a clear bias.

175. The 11/3/15 post-denial "Clinical Consultant Review" by Nurse Newtown shrugged off both Dr. Donald Miller's detailed 7-page report of 10/28/15 and his previous report of 4/6/15 as two additional *"advocacy statements"*. She then concluded that Plaintiff has some mere *"work capacity"*, which says practically nothing as far as his ability to perform the material duties of his own occupation is concerned.

176. The 11/3/15 claim file entry by Ms. LaBrecque indicates that she disregarded the responses of both Dr. Donald Miller and Dr. Chopan to her three-question "Yes / No" query with a simple *"does not alter prior claim determination"*, while elevating the "denial-friendly" assessment of Nurse Newtown above the opinions of those two doctors

177. Aetna failed to seriously consider the medical reports of treating, examining and reviewing physicians. Instead, it elected to rely upon flawed paper-review reports. That clearly demonstrates not only a selective review of evidence, but also biased and self-interested decision-making.

//

178. Aetna's financial motivation in this case is transparently obvious, based not only on the timing of these events in relation to each other, but on the fact that nothing else explains the ultimate decision to deny benefits. Accordingly, the motivation for Aetna's benefit denial was strictly financial and thus the investigation that was undertaken to accomplish it was improperly outcome-oriented. That is biased and conflicted decision-making, at its essence.

***Manipulation and Concealment of Evidence***

179. During Aetna' STD investigation, a massive amount of information was compiled by Aetna, pertaining to Plaintiff's diagnoses, medical history and treatment, evidence of restrictions, limitations and resulting work impairment, as well as an independent "peer review" by Aetna's own chosen physician.

180. Although the 8/10/15 claim file entry by Jannelle Zavala captioned "STD to LTD Transition Information" indicates that the STD file was mailed to Aetna's LTD division on that date, it appears that Aetna LTD personnel either transferred over those documents from the STD file that they wanted to see, or else purged the LTD file (and investigation) of any evidence from the STD file that they did not want to consider. That is a blatant manipulation of the evidence.

181. Although the 8/13/15 claim file entry by Melonee Ferguson captioned, "LTD Initial Assessment", specifically referenced the fact that the STD claim had been reinstated, based on a "peer review dated 6/19/2015". Dr. Rubin's 6/19/15 report, which was highly supportive of Plaintiff's impairment was nowhere to be found in the LTD file, nor were there any further references made to it anywhere in the LTD file, indicating that it was removed from the LTD file. Dr. Rubin's report was never mentioned again, after Ms. Ferguson's 8/13/15 claim file entry.

182. Although some of the evidence from the STD file was found in the LTD file received by Mr. McKuin from Aetna on 11/25/15, most of it was not. Specifically, medical records and reports of Drs. Chopan, Schnur and Donald Miller, obtained during Aetna's STD investigation were missing from the LTD

file. There were other documents that were not found in either the LTD file or the STD file that was later produced on 1/12/16, such as some of Dr. Lal's office visit notes, Dr. Donald Miller's 3/7/15 report, Dr. Stevens' 11/18/13 MRI report and Dr. McKnight's 11/26/13 EMG report. There are references throughout both files to the EMG and MRI reports, indicating that these reports were in those files at one time, but were deliberately removed from the files that were sent to Mr. McKuin.

***Determination on Review was Untimely under the Regulations***

183. Under the federal regulations, a Plan must determine an administrative appeal within 45 days of receipt or notify the claimant in writing (by the 45th day) that "special circumstances" require an extension is required in which case it has another 45 days to determine the appeal.

184. Ms. Young's 5/3/16 letter stated that Aetna was *"placing the appeal review on hold until I receive any additional information. This is called Tolling"*. The regulations permit no such "tolling" in a case such as this one. 29 C.F.R. § 2560.503-1(i)(4) starts the clock when the appeal is filed, *"without regard to whether all the information necessary to make a benefit determination on review accompanies the filing."* The regulation only allows "tolling" of the regulatory period, *"<u>due to a claimant's failure to submit information necessary to decide a claim</u>."* [29 CFR 2560.503- 1(i)(4)]. Furthermore, the *"failure"* referenced by the regulation is specifically a failure to provide information *"<u>to decide a claim</u>"*, not any alleged failure to provide information to decide an appeal.

185. There was absolutely no failure of Plaintiff to submit anything to the Aetna. Therefore, the time limits imposed by the regulations were not tolled and a decision on the appeal was due within the time limits specified above.

186. Mr. McKuin's 4/1/16 administrative appeal letter was received by Aetna on 4/6/16. A timely response was due within 45 days (i.e. on or before 5/21/16). Aetna did not mail out its 6/10/16 final determination letter until 6/13/16. Accordingly, it was untimely under the regulations.

***Final Denial was Improperly Based on Undisclosed Reports***

187. 29 CFR 2560.503-1, Subsection (h)(3)(iii) provides: "Full and fair review" of an adverse benefit determination requires that "a claimant shall be provided, upon request . . . copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section." Subsection m(8) of that regulation ("Definitions") states in pertinent part: "A document, record, or other information shall be considered 'relevant' to a claimant's claim if such document, record, or other information . . . (i) Was relied upon in making the benefit determination; (ii) Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination."

188. Plaintiff's benefits were denied on the grounds stated in Ms. LaBrecque's 10/29/15 letter.

189. By his 11/10/14 letter, Mr. McKuin, made the following specific request: "So that I can intelligently assess the reasons for denial, supplement the record as needed, and perfect a fair administrative appeal, I hereby request that you immediately provide me with the following documents and information: 1. A copy of Mr. Miller's entire claim file. I wish to stress that I need to see the entire claim file, (not just parts of it deemed pertinent by Aetna), including any reports, correspondence, internal emails, memos, or other documents relating to or referencing any review of Mr. Miller's medical records or his LTD claim by any of the Plan's reviewing nurses, physicians and/or vocational consultants . . ."

190. In preparing his administrative appeal, Mr. McKuin relied on the documents produced by Aetna in response to his specific request. Indeed, he could not have relied upon anything else.

//

191. In support of the appeal, Mr. McKuin submitted additional documentation, which was specifically allowed by the regulations. The appeal was specifically directed to the grounds stated in that 10/29/15 denial letter. By necessity, it was not aimed at any grounds not articulated prior to the appeal, or at any evidence not obtained, created or produced prior to the appeal. Nor could it be.

192. Although Mr. McKuin's 4/1/16 appeal letter did address procedural irregularities in the handling of Plaintiff's LTD claim by Aetna, it did not raise any new issues as far as Plaintiff's diagnosis, restrictions, limitations, resulting impairment or disability are concerned. Mr. McKuin did submit updated office visit notes and reports from Plaintiff's doctors, an updated X-ray report as well as certain older office visit notes and an MRI report that were missing from Aetna's LTD and STD claim files. In addition, he submitted a vocational assessment report and a neuro-psychological evaluation report, which Aetna had failed to obtain on its own. However, no new reason for or theory of disability was advanced.

193. The initial denial was upheld by Aetna by its letter dated 6/10/16.

194. Aetna's determination on review was to be directed to the appeal of its initial denial and the scope of its review was to be limited to the evidence in the administrative record that was before it on appeal. It was not to be based on some other new administrative record that Aetna wished to construct, after the fact.

195. In conducting its final review of Plaintiff's administrative appeal, Aetna did not limit its review to the evidence before it. Instead, it proceeded to gather additional medical review reports to try to prop up its initial denial.

196. Having first denied Plaintiff's LTD benefits, without justification, Aetna sought to take an extension beyond the initial 45 days allowed for review, <u>not merely to review the correctness of the initial denial, but to commence a whole new claims investigation</u>. That is contrary to the entire ERISA claims review process. Neither the regulations, nor the case law provides for any such review.

//

197. Mr. McKuin’s 5/11/16 letter to Aetna objected to any further post-denial medical reviews and he stated that if Aetna obtained any additional evidence, it should disclose it before any adverse decision was to be made on the appeal, so that he would have a reasonable opportunity to review and respond to such evidence, before any final decision was made.

198. Aetna refused to disclose those additional reports, despite Mr. McKuin’s specific written demands therefor; and then it ultimately relied upon those reports to uphold its initial denial; thus, switching rationales for denial in the process. That circumvents the entire ERISA review process, which contemplates an administrative review based on a closed record. It also demonstrates

199. Any such documents (especially those relating to medical or vocational reviews) generated or otherwise relied upon by Aetna were clearly “relevant”, under the regulations, to Plaintiff’s claim should have been made available for review and response before any final determination on review was made by Aetna. 29 CFR 2560.503-1, Subsections (h) and (m).

200. Because of Aetna’s failure to follow the regulations, its review of Plaintiff's administrative appeal was neither “full” nor “fair”. These procedural irregularities are to be weighed as factors in deciding if there was an abuse of discretion.

***Plaintiff's Entitlement to LTD Benefits***

201. All of the relevant evidence in the administrative record establishes that Plaintiff is “disabled” as defined by the Plan, and thus, Plaintiff is entitled to receive LTD benefits and has been so entitled at all times since 10/2/15.

202. The denial of Plaintiff's LTD claim is contrary to the terms of the Plan; it is unreasonable; it is in bad faith; and it is an abuse of discretion.

203. Plaintiff is entitled to recover from the Plan the entire amount of accrued back benefits that have not been paid plus benefits that are expected to accrue in the future.

**SECOND CLAIM FOR BREACH OF FIDUCIARY DUTY**

**29 USC Section 1104(a)(1)(D)**

204. Plaintiff repeats, adopts and re-alleges each and every allegation contained in the above paragraphs 1 through 203 inclusive above and incorporates said allegations herein as though fully set forth at length.

205 The transfer of Plaintiff's LTD claim from the LTD claims division to the RMU on 8/27/15 raises an inference that Aetna allowed its financial interests to impact its fiduciary responsibilities to Plaintiff. See: *Metropolitan Life Ins. Co. v. Glen*n, 128 S. Ct. 2343, 2351 (2008).

206. Aetna has breached its fiduciary duties owed to Plaintiff by not following the plan document(s) as defined by 28 U.S.C. §1104(a)(1)(D).

207. Aetna has breached its fiduciary duties owed to Plaintiff by not acting with care, skill, prudence and diligence that a prudent man or entity in similar circumstances would have acted with under 29 U.S.C. §1104(a)(1)(B).

208. The evidence in the administrative record contains overwhelming evidence that Plaintiff met the plan definition of "Own Occupation" disability.

209. Aetna disregarded the relevant evidence, establishing Plaintiff's eligibility for "Own Occupation" LTD benefits, while elevating and excessively weighing less relevant evidence to the contrary.

210. As a direct result of Aetna's wrongful conduct, Plaintiff may be found ineligible for further Leave of Absence (LOA) status, and as a direct result Plaintiff's employment may be terminated.

211. As a direct result of Aetna's wrongful conduct, in addition to loss of LTD benefits, Plaintiff has suffered or will suffer actual damages in addition to the loss of LTD benefits, in an amount to be proven at trial, but which Plaintiff is informed and believes is not less than $228,000 for loss of deferred compensation that would have otherwise vested but for Aetna's breaches of fiduciary duty, as herein alleged; and $750,000 for loss of the value of Plaintiff's "book of

business", which Plaintiff could have sold had had it not been for any termination employment that resulted or results from Aetna's wrongful conduct.

212. In equity, this Court must make Plaintiff whole following Aetna's breach of duty and fashion the relief necessary to protect the rights of the participant. Therefore, the Court has broad discretion to fashion appropriate relief. Based on the facts of this case, Plaintiff should be entitled to "other equitable relief", including but not necessarily limited to surcharge, because the relief available under 29 U.S.C. § 1132(a)(1)(B) does not make Plaintiff whole for his losses arising from Aetna's breach of fiduciary duty. A surcharge is an equitable monetary remedy against a fiduciary, which puts the beneficiary in the position he would have been in, but for the fiduciary's breach.

***Declaratory Relief Requested and Recovery of Benefits Sought by Plaintiff***

213. On the basis of the foregoing, an actual controversy has arisen and now exists between Plaintiff and Defendant, in that Plaintiff contends and Defendant denies the following:

(a) That Plaintiff is disabled, as defined by the Plan, and is entitled to receive LTD benefits, as provided by the provisions of the LTD plan;

(b) That Defendant is obligated, under the terms, conditions, and provisions of the Plan and/or ERISA, to pay Plaintiff the LTD benefits accruing to her under the terms and provisions of the Plan and Defendant has failed to do so;

(c) That Defendant is obligated to pay Plaintiff all accrued past benefits as are due in a sum to be proven at trial, but which plaintiff is informed and believes is not less than $ 192,805.02, as of the date of filing of this Complaint, consisting of an estimated $21,422.78 (60% of $35,704.60 per monthly predisability income) times 9 months.

(d) That Defendant is obligated to immediately commence payment of

monthly LTD benefits, in an amount to be proven at trial, but which Plaintiff is informed and believes is not less than $21,422.70 per month for every month of Plaintiff's continued disability.

(e) That Defendant is obligated make Plaintiff whole for his losses arising from its breach of fiduciary duty in an amount to be proven at trial, but which Plaintiff is informed and believes is not less than $978,000.

(f) That Defendant has acted in an arbitrary and capricious manner and has abused its discretion under the plan.

214. Plaintiff desires a judicial determination of the respective rights and duties of Plaintiff and Defendant, with respect to the above-referenced claim and the amount thereof.

215. Such a declaration is necessary and appropriate at this time and is specifically authorized by 29 USC Section 1132(a)(1)(B).

216. The actions and conduct of Defendant has and will directly and proximately cause a loss of income to Plaintiff and has and will deprive Plaintiff of the protections of ERISA.

217. Plaintiff has no adequate remedy, other than as herein prayed for, to redress the present violation of the Plan provisions and of the law; nor does any other adequate remedy exist, by which the rights of the parties may be determined.

**WHEREFORE**, Plaintiff prays judgment against Defendant, as follows:

1. A Judgment declaring the respective rights and obligations of the parties pertaining to the entitlement and amount of benefits due;

2. A money Judgment for all benefits to which Plaintiff is entitled;

3. For reasonable attorney fees, pursuant to 29 USC § 1132 (g), or as otherwise allowed by law.

4. For costs of suit;

//

5. For pre-judgment interest on the principal sum, accruing from the date the obligations were incurred. *Drennan v. General Motors Corp. (6th Cir., 1992) 977 F.2d 246, 253.*

6. For such other, further and different relief as the court may deem just and proper.

DATED July 26, 2016

*/s/ Michael A. McKuin*

Michael A. McKuin
Attorney for Plaintiff,
MARC MILLER

//

//

//